UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHERRY YOUNT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:12 CV 1762 DDN |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Sherry Yount for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 9.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Sherry Yount, born on November 22, 1963, filed applications for Title II and Title XVI benefits on April 9, 2010. (Tr. 138-148.) She alleged an onset date of disability of June 17, 2007, amended to April 7, 2009, due to deafness, asthma, bronchitis, high blood pressure, and depression. (Tr. 169, 198.) Plaintiff's application

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

was denied initially on July 9, 2010, and she requested a hearing before an ALJ on August 6, 2010. (Tr. 86-90, 93-97.)

Plaintiff appeared before the ALJ on July 19, 2011. (Tr. 27-75.) Following the hearing, the ALJ found plaintiff not disabled on August 24, 2011. (Tr. 11-22.) On August 27, 2012, the appeals council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On July 23, 2005, plaintiff arrived at the emergency room, complaining of chest pain, an unproductive cough, shortness of breath, headache, swollen legs, and aching joints. Plaintiff stated that the chest pain began three days ago at work and that she drank soda to relieve the pain. X-rays revealed a clear chest. Randall A. Howell, D.O., diagnosed asthma and bronchitis and prescribed sulfamethoxazole/trimethoprim, albuterol, and guaifenesin with codeine to plaintiff.[2] (Tr. 426-36.)

On June 12, 2006, plaintiff reported that she went the emergency room the previous evening after falling down the stairs. She further reported negative X-rays and a Motrin prescription. (Tr. 250.)

On April 25, 2007, plaintiff arrived at the emergency room, complaining of an unproductive cough that began one week earlier, which caused pain in her side and back. She reported that she had not slept for two days due to the coughing fits. X-rays revealed clear lungs. Greg M. Polites, M.D., diagnosed rhinitis and asthma and prescribed prednisone and albuterol to plaintiff.[3] (Tr. 406-25.)

---

[2] Sulfamethoxazole/trimethoprim is used to treat bacterial infections and certain types of pneumonia. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013). Guaufenesin is used to treat coughing and chest congestion symptoms. Id.

[3] Prednisone is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

On April 30, 2007, plaintiff met with David Glick, M.D., regarding her recent emergency room visit. She smoked a half pack of cigarettes per day. He found bilateral wheezing, regular rate and rhythm, and no clubbing. Dr. Glick advised plaintiff to continue prednisone, prescribed Asmanex and albuterol, and advised plaintiff to quit smoking.[4] (Tr. 249.)

On September 30, 2007, plaintiff arrived at the emergency room, complaining of shortness of breath, frequent cough, severe chest pain, and headache. She also reported that she could walk only a half block due to shortness of breath and suffered depression. X-rays revealed no acute cardiopulmonary disease. Douglas M. Char, M.D., diagnosed migraine, asthma, and hypertension. (Tr. 393-405.)

On December 18, 2007, plaintiff reported that she smoked a half pack of cigarettes per day for over thirty years. Dr. Glick found plaintiff's lungs clear and diagnosed asthma. He prescribed Symbicort and albuterol and advised plaintiff to stop smoking.[5] (Tr. 248.)

On January 18, 2008, plaintiff arrived at the emergency room, complaining of tooth pain. Elizabeth A. Seliga, F.N.P., diagnosed plaintiff with dental pain and prescribed oxycodone. (Tr. 381-92.)

On February 1, 2008, Dr. Glick found plaintiff had bilateral wheezing, regular rate and rhythm, and periodontal disease. Plaintiff reported that Symbicort did not significantly relieve her shortness of breath and cough and that she had been smoking

---

[4] Asmanex is used to control and prevent symptoms (wheezing and shortness of breath) caused by asthma. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

[5] Symbicort is used to control and prevent symptoms (wheezing and shortness of breath) caused by asthma or ongoing lung disease (such as COPD). WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

less. He advised plaintiff to continue her blood pressure medication and to quit smoking. Further, he increased her Symbicort dosage and prescribed ranitidine.[6] (Tr. 247.)

On May 29, 2008, Dr. Glick noted plaintiff required vaccination records for a new job. Dr. Glick prescribed Rhinocort due to complaints of allergies. Also, plaintiff complained of thigh numbness. Dr. Glick diagnosed LFCN entrapment.[7] (Tr. 246.)

On June 30, 2008, plaintiff arrived at the emergency room, complaining that hot grease splashed on her face and eyes as she cleaned a grill at work. Blake W. Anderson, M.D., diagnosed burns on her face, forehead, and cheek. (Tr. 369-80.)

On October 30, 2008, Dr. Glick noted plaintiff's generally stable pulmonary symptoms and that she tolerated Symbicort well. His exam revealed no ear, nose, or throat problems, clear lungs, and regular rate and rhythm of breathing. He advised plaintiff to continue Symbicort and albuterol and advised her to stop smoking. (Tr. 244.)

On March 19, 2009, plaintiff arrived at the emergency room, complaining of a headache lasting two weeks, left side shoulder pain that radiated to her knee, blurred vision, ringing in her ears, bitter taste, and seeing "a light that flicks on every once and a while and a following shadow." Erica R. Casey, M.D., diagnosed flu-like symptoms, headache, and hypertension. She prescribed lisinopril and hydrochlorothiazide.[8] (Tr. 351-68.)

On August 27, 2009, plaintiff arrived at the emergency room, complaining of shortness of breath and a cough. A chest X-ray revealed clear lungs. Christopher

---

[6] Ranitidine is used to prevent and treat heartburn and other symptoms caused by too much acid in the stomach (acid indigestion). WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

[7] LFCN entrapment is a pinched or compressed lateral femoral cutaneous nerve. Mayo Clinic, http://www.mayoclinic.com/health (last visited August 1, 2013).

[8] Lisinopril and hydrochlorothiazide are used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

- 4 -

Brooks, M.D., diagnosed plaintiff with asthma and chest wall pain. He prescribed albuterol, prednisone, oxycodone, and metaxalone[9]. (Tr. 330-50.)

On September 3, 2009, Dr. Glick noted plaintiff's recent emergency room visit. In spite of contrary assurances, Dr. Glick stated that plaintiff had not been taking her blood pressure medicine properly. He found no increase in work of breathing and no wheezing. He prescribed Qvar, albuterol, and lisinopril.[10] (Tr. 243.)

On November 23, 2009, plaintiff met with Dr. Glick regarding sickness and congestion. Dr. Glick found bilateral wheezing and diagnosed acute asthma exasperation and possible bronchopneumonia. Dr. Glick prescribed Xopenex, doxycycline, prednisone, and albuterol.[11] (Tr. 242.)

On February 8, 2010, plaintiff arrived at the emergency room, complaining of chest pain and a toothache. She consumed alcohol and marijuana to alleviate the pain, but the pain increased in severity. She indicated that she suffered the pain chronically but that it was typically less severe. A chest X-ray revealed clear lungs. Dr. Mullins diagnosed plaintiff with abdominal epigastric pain, chest pain, acute alcohol intoxication, alcoholism, and cannabis abuse. Plaintiff left the emergency room prior to receiving aftercare instructions or prescriptions. (Tr. 290-313.)

On March 14, 2010, plaintiff visited the emergency room, complaining of a headache, blurred vision, cough, vomiting, and diarrhea. Plaintiff rated her headache pain as 10 of 10. A CT scan revealed no acute intracranial process and bilateral sphenoid sinus mucosal thickening and fluid. A chest X-ray revealed a streaky left basilar opacity

---

[9] Metaxalone is used to treat muscle spasms or pain. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

[10] Qvar is used to treat asthma. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

[11] Xopenex is used to treat wheezing and shortness of breath. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013). Doxycycline is an antibiotic. Id.

and likely atelectasis. Further, an EKG indicated no significant change from a prior EKG. David Seltzer, M.D., diagnosed bronchitis and a headache. (Tr. 260-89.)

On July 8, 2010, Stanley Hutson, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. He found no medically determinable impairment. (Tr. 456-66.)

On November 1, 2010, plaintiff reported chronic back pain radiating down her left leg and numbness. Dr. Glick found her asthma stable and opined that plaintiff suffered a pinched nerve. (Tr. 571.)

On November 5, 2010, plaintiff arrived at the emergency room by emergency medical services, complaining of chest pain that radiated to her right back. She described the pain as crushing and reported only a single episode. Plaintiff also reported smoking one pack of cigarettes per day, drinking heavily until five months earlier, and smoking marijuana daily. A cardiac catheterization revealed elevated left ventricular filling pressure, moderate left ventricular systolic dysfunction, and no angiographic coronary artery disease. Robert H. Neumayr, M.D., diagnosed ST-elevation myocardial infarction. Plaintiff was discharged on November 9, 2010. (Tr. 530-64.)

On November 16, 2010, plaintiff arrived at the emergency room, complaining of right arm and shoulder pain as a result of her cardiac catheterization. Joseph Walline, M.D., diagnosed plaintiff with cervical radiculopathy and provided an arm sling.[12] He also prescribed Motrin and Percocet. (Tr. 513-30.)

On December 20, 2010, Abhay Laddu, M.D., saw plaintiff for coronary artery disease. Plaintiff reported an additional mild chest pain episode, which she resolved with nitroglycerin SL. Dr. Laddu diagnosed plaintiff with coronary artery disease, asthma,

---

[12] Cervical radiculopathy is a disorder of the cervix relating to spinal nerve roots. Stedman at 351, 1622.

- 6 -

and hypertension. He continued her on clopidogrel and aspirin and advised that she stop smoking.[13] (Tr. 469-76.)

On January 2, 2011, plaintiff arrived at the emergency room by emergency medical services after falling down and hearing her knee pop. Plaintiff reported that she fell due to dizziness, which she believed was caused by a change in her blood pressure medication. X-rays revealed a right tibia-fibula fracture, and an ultrasound revealed a torn medial meniscus. On January 5, 2011, John T. Watson, M.D., successfully installed a plate in plaintiff's knee and repaired plaintiff's medial meniscus. David R. Thomas, M.D., diagnosed right tibia and fibula fracture, left leg deep vein thrombosis, recent ST elevation coronary artery disease, hypertension, and asthma.[14] He instructed plaintiff to avoid weight on her right leg and to follow up with orthopedic surgeon Dr. Watson. Dr. Thomas discharged plaintiff on January 11, 2011. (Tr. 480-512.)

On January 24, 2011, Dr. Glick noted plaintiff's high blood pressure. Dr. Glick instructed plaintiff to restart lisinopril, continued Coumadin, and noted that he still had not received plaintiff's emergency room records.[15] (Tr. 568.)

On January 25, 2011, plaintiff reported that she wore a hinged knee brace at all times and dressed her wound with gauze daily. She also reported that she continued to suffer pain in her knee joint, anterior tibia, and ankle and alleviated her pain with Percocet. Dr. Watson recommended that she continue to avoid weight on her right leg and perform her home physical therapy regimen and refilled her Percocet prescription. (Tr. 597-98.)

---

[13] Clopidogrel is used to prevent heart attacks and strokes in persons with heart disease (recent heart attack), recent stroke, or blood circulation disease (peripheral vascular disease). WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

[14] Deep venous thrombosis is the formation of one or more thrombi in the deep veins, usually of the lower extremity or in the pelvis. Stedman at 1985.

[15] Coumadin is used to treat and prevent blood clots. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

On February 28, 2011, plaintiff complained of depression, loss of sleep, lack of appetite, difficulty concentrating, right foot swelling and pain, and that she experienced difficulty breathing two or three weeks after exhausting her Qvar and albuterol. Gloria Lehmann assessed asthma exasperation, depression, and potential arterial insufficiency. She prescribed Q-Var and venlafaxine.[16] (Tr. 587.)

On March 1, 2011, Dr. Watson noted that plaintiff performed exercises at home but could not obtain physical therapy due to lack of insurance. Plaintiff complained of pain in her lower right leg and reported that her mother assisted her with leg elevation. She also reported that prior to her injury, she suffered pain in both legs after walking more than one or two blocks. X-rays revealed well-positioned hardware and a healed fracture. (Tr. 594-95.)

On March 28, 2011, Dr. Glick noted improved tolerance of weight on the right leg and improved depression. (Tr. 586.)

On April 12, 2011, Dr. Watson stated that she had been approved for weight on her right leg as tolerable. Plaintiff reported use of a walker but that pain prevented her from extended use of a cane. He encouraged her to wean herself from the walker. (Tr. 593-96.)

On April 27, 2011, Dr. Glick assessed coronary artery disease, hypertension, deep venous thrombosis, asthma, and nicotine dependence. Dr. Glick prescribed Crestor and trazodone and told plaintiff to continue Coumadin.[17] (Tr. 582-84.)

On May 27, 2011, plaintiff complained of right shoulder pain and requested a higher dosage of venlafaxine. She reported improved depression, ability to walk, and stable asthma. Dr. Glick diagnosed coronary artery spasm, deep venous thrombosis,

---

[16] Venlafaxine is used to treat depression and other mental/mood disorders. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013).

[17] Crestor is used along with a proper diet to help lower "bad" cholesterol and fats (such as LDL, triglycerides) and raise "good" cholesterol (HDL) in the blood. WebMD, http://www.webmd.com/drugs (last visited on August 1, 2013). Trazodone is used to treat depression. Id.

asthma, and depression. Dr. Glick increased plaintiff's venlafaxine dosage and continued Coumadin. (Tr. 580-81.)

On June 20, 2011, Dr. Glick planned to discontinue Coumadin the following month after six months of therapy and noted that plaintiff had obtained Medicaid. Plaintiff reported smoking one-half to one pack of cigarettes per day. Dr. Glick diagnosed deep venous thrombosis. (Tr. 578-79.)

**Testimony at the Hearing**

The ALJ conducted a hearing on July 29, 2011. (Tr. 29-75.) Plaintiff testified to the following. She is age 47 and completed the ninth grade. She left school in tenth grade due to home and school abuse. She is married but separated from her husband. She measures five feet, two inches and 208 pounds. She lives with her disabled mother, age 64, in a one-story house. Her mother suffers from seizures and depression. On April 21, 1994, she was arrested for a DWI. Her driver's license was suspended, and she never renewed it. (Tr. 31-33, 35, 51-53.)

She is not currently unemployed and receives food stamps. In the 1980s, she received workers compensation due to breaking her left ring finger in a machine. From 2008 to April 7, 2009, she received unemployment benefits after her place of employment, Uncle Wimpy's, closed. On June 15, 2011, she obtained Medicaid coverage. (Tr. 35-37.)

She last worked at Uncle Wimpy's for four or five months. She cooked, cleaned, and washed dishes, which caused her difficulty. She splashed grease on herself as she cleaned a grill. After Uncle Wimpy's closed, she babysat a three month old child with the assistance of her mother about twice per week for one month until her heart attack. The child weighed about ten pounds. Before Uncle Wimpy's, she worked for Restaurant Unlimited as a cook and server. She also worked for a short time at Cattling Steakhouse but walked off the job after a disagreement with the owner. She also worked at Cattling Steakhouse for two or three months in 1997. (Tr. 37-39, 41, 52.)

She worked at a gas station for the Cite Oil Company of Missouri as a cashier and stocker, and she swept, mopped, cleaned, and bagged ice.  She cannot recall working at Gaines and Associates in 1997.  She worked for Villa Helen Marie Residential at a nursing home for about two or three months, caring for the elderly.  She also worked for Adam Taylor Enterprise, a temp agency, which placed her mainly at plastic factories, where she operated ejection molding machinery.  She checked labels at Eureka Music Center.  She worked at Quality Trim, a sewing factory that sold and packed patent leather. (Tr. 39-45.)

In November 2010, plaintiff suffered a heart attack.  She continues to receive treatment, taking medication and consulting her physician every six months.  She has suffered from depression for three years with increased severity during the last one or two years.  She does not see a specialist, but her doctor began prescribing medication for depression three or four months ago.  Depression causes anger and the desire to sleep. Occasionally, she does not bathe for as long as two weeks.  Since January 2011, she has cried daily, and before, she cried monthly.  The crying episodes last ten minutes to an hour and are unpredictable.  (Tr. 45-46, 61-63.)

Her legs numb, and she cannot stand for long.  On January 2, 2011, she broke her right leg by slipping after a spell of dizziness.  She also has asthma, and she has taken asthma medication for twenty years.  The asthma symptoms increase in severity during winter.  Further, her legs, back, and arms give her problems.  Going into public irritates her because she cannot hear, and she cannot cope.  In 1990, her ex-boyfriend flushed her hearing aids.  She cannot wear them due to the resulting ear pain.  Her ears ring constantly.  (Tr. 46-48, 50.)

She smokes a half pack of cigarettes per day, despite her physician's advice.  In January 2011, she reduced her smoking from a pack and a half per day to a half pack per day.  Her medication causes nausea and bloating.  She was an alcoholic but has been sober for about a year.  When she drank, she drank Bud Light, rum, and Jack Daniels. She last used marijuana in 2010.  (Tr. 49-51.)

Her daily activities include watching television, cleaning her house, showering, and caring for her mother by reminding her to take medication.  She used to cook full course meals and vacuum the floors.  She occasionally washes dishes.  She owns three cats but can no longer clean their litter box due to her asthma.  She can count change and pay bills.  Since her leg injury, she cannot walk a block and a half.  At age 18, she was in a car accident, which causes fear of car rides.  She cannot hold a gallon of milk.  Her mother suffers seizures and gallbladder problems.  She occasionally accompanies her mother for doctor appointments. (Tr. 54-56.)

In April 2010, she became more depressed and lost the will to perform many daily activities.  She cooks only by placing food in the oven.  An aid hired by her mother washes the dishes.  She tries to launder and vacuum, but maintenance performs her yard work and removes her trash.  She shops for groceries, but she requires assistance to carry them. (Tr. 56-59.)

She can walk for about twenty minutes and stand for about fifteen minutes.  She can sit for only a few minutes before back pain requires her to stand.  Lifting a gallon of milk is difficult for her.   (Tr. 60.)

Headaches cause anger, yelling, crying, and neck paralysis due to the pain caused by movement.  They also cause blurred vision, nausea, and vomiting and last until she receives a shot at the hospital.  She has not been to the hospital for headaches in some time.  Typically, she takes Tylenol or ibuprofen for the headaches.  The headaches accompanied by vomiting occur every morning and last two to three hours.  Since 2007, she has taken oxycodone intermittently for pain, which causes itchiness.  (Tr. 63-64.)

As a child, her mother abused her mentally and physically, which continues to affect her.  She often dwells on the abuse, which causes crying.  Although she has questioned her mother, her mother has no response or cannot remember. (Tr. 64-65.)

Vocational expert (VE) Delores E. Gonzalez also testified at the hearing.  Plaintiff worked as a cook, which is medium, unskilled work, waitress, which is light, semi-skilled work; as a convenience store clerk, which is light, unskilled work; as a nurse's aide, which is medium, semi-skilled work;  as an ejection molding machine operator, which is

medium, semi-skilled work; and as a sewing machine operator, which is light, semi-skilled work. Customer service skills from her past work transfer to other fields. (Tr. 68-69.)

The ALJ presented a hypothetical individual with the claimant's education, training, work experience, and the ability to perform medium work, except that such individual could climb stairs and ramps only occasionally, never climb ropes, ladders, or scaffolds, and should avoid concentrated exposure to extreme temperatures, fumes, odors, dust, and gas. The VE responded that such individual could perform plaintiff's past work as a sewing machine operator, work with 1,830 positions locally, in the St. Louis area, 3,400 jobs in Missouri, and 165,680 jobs nationally. Such individual could also perform as a waitress, work with 24,600 positions locally, 49,900 positions in Missouri, and 2,302,070 positions nationally. Further, such individual could perform work as nursing aid with 17,510 positions locally, 40,410 positions in Missouri, and 1,438,010 positions nationally. The individual could also perform as a convenience store clerk, work with 33,790 position locally, 77,400 positions in Missouri, and 3,439,380 positions nationally. (Tr. 69-72.)

The ALJ then altered the first hypothetical by restricting the hypothetical individual to light work. The VE responded that such individual could perform work as a waitress or convenience store clerk. (Tr. 72-73.)

Next, the ALJ altered the second hypothetical individual by adding a sit/stand option with the ability to change positions frequently. Further, such individual could only remember and perform simple instructions, perform non-detailed tasks, adequately make simple work-related decisions, adapt to routine, simple work changes, perform repetitive work according to set procedures, sequence, and pace, and perform some complex tasks. The VE responded that such individual could perform as a convenience store clerk for about half of the positions. Such individual could also perform a mail clerk position, which is light, unskilled work with 1,680 positions locally, 3,430 positions in Missouri, and 131,750 positions nationally. (Tr. 73.)

Lastly, the ALJ altered the third hypothetical individual by requiring that the individual miss three workdays per month. The VE responded that such individual could perform no competitive work. (Tr. 73-74.)

The VE could identify no Dictionary of Occupational Titles source regarding simple instructions, sit/stand options, or reduction of the number of available positions due to hypothetical impairments. The VE testimony was consistent with the Dictionary of Occupational Titles but supplemented with her professional experience. (Tr. 74.)

### III. DECISION OF THE ALJ

On August 24, 2011, the ALJ issued a determination that plaintiff was not disabled. (Tr. 11-22.) At Step One of the prescribed regulatory decision-making scheme,[18] the ALJ found plaintiff had not engaged in substantial gainful activity since April 7, 2009, the alleged onset date. (Tr. 13.)

At Step Two, the ALJ found that plaintiff's severe impairments included obesity, asthma, hypertension, deep venous thrombophlebitis, depression, and residuals of fracture of her right tibia and fibula. (Tr. 13.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 14.)

The ALJ considered the record and found that plaintiff had the requisite functioning capacity (RFC) to perform light work, except plaintiff must have a sit/stand option with the ability to change positions frequently; can occasionally climb stairs and ramps; stoop; kneel; crouch; and crawl; but never climb ropes, ladders, or scaffolds, and must avoid concentrated exposure to extreme temperatures, fumes, odors, dust, and gases. Further, the ALJ found that plaintiff could understand, remember, and perform simple instructions and non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, adapt to routine, simple work changes, perform repetitive work

---

[18] See below for explanation.

according to set procedures, sequence, or pace, and perform some complex tasks. At Step Four, the ALJ found that plaintiff could perform her past work as a convenience store clerk. (Tr. 21.)

At Step Five, the ALJ found plaintiff capable of performing jobs in significant numbers in the national economy. (Tr. 22.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If

the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to his PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that (1) the ALJ's erred by failing to support the RFC determination with medical evidence and that (2) the VE's testimony is not credible due to conflicts with Dictionary of Occupational Titles and other vocational resources.

**A. RFC Determination**

Plaintiff argues that the medical evidence does not support the RFC determination. "A claimant's residual functional capacity is a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). "[T]he record must include some medical evidence that supports the ALJ's residual functional capacity finding." Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000).

Plaintiff argues the ALJ did not rely on medical evidence in determining plaintiff's RFC but that the ALJ relied on the absence of evidence.  However, "[a] disability claimant has the burden to establish her RFC." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).  Although the ALJ has a duty to develop an underdeveloped record, Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), here, the record contains evidence of regular medical care and documents her impairments, including asthma, hypertension, deep vein thrombosis, leg fracture, and depression.  Moreover, the ALJ's decision of no disability may be supported by the lack of significant restrictions imposed by physicians.  See

Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999). Therefore, the ALJ did not err by relying on the absence of evidence in part to formulate the RFC.

Although plaintiff challenges no specific portion of the RFC determination, analysis of the RFC determination and the record demonstrates that plaintiff's argument is without merit. The ALJ noted plaintiff's intermittent treatment for asthma in July 2005, April 2007, September 2007, August 2009, and November 2009. (See Tr. 247, 330-50, 406-36, 587.) The ALJ found that the record did not show that plaintiff's asthma required frequent emergency room visits when properly treated. (Tr. 19.) He also found no evidence of spirometry tests revealing persistent, significantly deficient forced expirations capabilities;[19] no medical evidence of prolonged symptomatic episodes unremitting to intensive treatment; no ongoing observation of significant breathing difficulties; or prolonged breathing difficulties, such as severe weakness, gross pulmonary hyperinflation, prolonged expiration, a depressed diaphragm, pursed lip breathing, a stooped posture, or marked use of accessory muscles during respiration. (Tr. 19.) Furthermore, the ALJ noted plaintiff's conditions of bronchitis and asthma and repeated failures to quit smoking against her physician's advice and despite the significant resulting burdens and limitations on her functional capacity. (Id.; Tr. 244, 247, 248, 249, 281, 418, 424, 436, 474, 584.); see Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) ("failure to follow a prescribed course of remedial treatment without good cause is grounds for denying an application of benefits") (citations omitted).

Next, the ALJ looked to plaintiff's hypertension. The ALJ noted that plaintiff did not take her blood pressure medication as prescribed. (Tr. 243.) Further, the ALJ found no evidence that any treating physician found her hypertension uncontrollable with treatment. (Tr. 19.)

The ALJ also considered plaintiff's hospitalization in November 2010 for chest pain. He noted left ventricular dysfunction but that the catheterization showed no obstructive coronary artery disease. (Tr. 541-42.) According to the record, plaintiff has

---

[19] Spirometry tests are used to measure lung function. WebMD, www.webmd.com/lung/lung-function-tests (last visited on August 1, 2013).

- 16 -

had only one subsequent episode of chest pain, which was mild and resolved with nitroglycerin. (Tr. 469-76.)

Also, the ALJ considered plaintiff's emergency room visit for right arm pain. (Tr. 513-30.) The ALJ found the symptoms mild. (Tr. 18.) Plaintiff's motor strength was 5 of 5 in all extremities, and plaintiff received a diagnosis of cervical radiculopathy. (Tr. 515-16.) Moreover, cardiac catheterization caused the pain, which she received only once, and the record indicates no subsequent complaints of right arm pain. (Tr. 514.)

Plaintiff alleges disability due to deafness. The ALJ noted the lack of support in the record. (Tr. 19.) Further, plaintiff's telephone interview revealed no complications with plaintiff's hearing, breathing, understanding, coherence, concentration, talking, or answering. (Tr. 170-72.) Further, the ALJ found that plaintiff answered questions in a logical manner without hesitation and did not display any outward signs that one would associate with an individual suffering from hearing loss. (Tr. 19.)

Plaintiff also alleges debilitating back pain. The record includes diagnoses of spinal radiculopathy and degeneration. (Tr. 401, 517.) However, the ALJ found no evidence that the back pain prevented her from working. (Tr. 19-20.) Further, the record contains evidence that plaintiff performed activities inconsistent with debilitating back pain, and plaintiff testified that she no longer performs some activities due only to depression. (Tr. 54-56, 184-88, 206-10.); see Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) ("acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain").

The ALJ supported the RFC determination with medical evidence. Accordingly, plaintiff's argument is without merit.

**B. Vocational Expert Testimony**

Plaintiff argues that the ALJ erred by relying on the VE's response to a hypothetical question that failed to capture the concrete consequences of plaintiff's impairments. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's

decision." Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007) (citations omitted). "Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the 'concrete consequences' of those impairments." Id.

In the ALJ's opinion, the ALJ relies on VE testimony given as a response to the ALJ's hypothetical question. (Tr. 21-22.) The hypothetical question involved an individual with an RFC that the ALJ later found to be plaintiff's RFC. (Tr. 15-16, 73.) Specifically, plaintiff argues that because substantial evidence did not support the RFC determination, the hypothetical question encapsulating that determination failed to capture the concrete consequences of plaintiff's impairments. However, as discussed above, substantial evidence supports the RFC determination. Accordingly, the ALJ did not err by relying on the VE's response to a hypothetical question.

Plaintiff also argues that Social Security Ruling 83-12 states that generally unskilled work is incompatible with a sit/stand option, which conflicts with the VE testimony and renders the VE not credible. The administrative ruling states:

> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring  work skills to such jobs, he or she would not be found disabled.  However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task.  Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12.

Plaintiff misconstrues Social Security Ruling 83-12. The ruling creates no categorical rule but articulates a broad statement that many unskilled jobs exclude individuals requiring sit/stand option. Id. It further requires VE consultation to evaluate claimants who require a sit/stand option. Id. In sum, the VE's testimony that an

individual requiring a sit/stand option can perform the unskilled work of a mail clerk or convenience store clerk does not contradict Social Security Ruling 83-12.

Plaintiff also argues that the VE testimony that an individual limited to plaintiff's RFC could perform as a mail clerk or convenience store clerk conflicts with the Dictionary of Occupational Titles (DOT). The DOT entries for mail clerk and convenience store clerks list a reasoning development level of 3 on a scale of 6. Dictionary of Occupation Titles, 1991 WL 688702 (4th ed., 1991) (DOT). Reasoning development level 3 is defined as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and deal] with problems involving several concrete variables in or from standardized situations." Id. Plaintiff argues that reasoning development level 1 most accurately reflects plaintiff's RFC. Reasoning development level 1 is defined as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions [and deal] with standardized situations with occasional or no variables in or from these situations encountered on the job." Id.

The Eighth Circuit has held that VE testimony that a claimant limited to simple instructions could perform work that the DOT listed with a reasoning development level of 2. Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010). Although the DOT lists mail clerk and convenience store clerk at an even higher reasoning development level, here, unlike in Moore, the RFC determination states that plaintiff can perform complex tasks and repetitive work according to set procedures, sequence, or pace. (Tr. 73.) The court finds plaintiff's RFC consistent with reasoning development level 3.

As in Moore, the record before the court does not suggest that the VE ignored the mental restrictions placed on the hypothetical individual. Moore, 623 F.3d at 599. Because substantial evidence supports the RFC determination, which the ALJ presented in hypothetical form, and because the VE's testimony did not conflict with the DOT, the ALJ properly relied on the VE's testimony.

Plaintiff also argues that the VE offered no basis other than her expertise to estimate the number of positions that allow a sit/stand option and failed to elaborate on

- 19 -

her experience with sit/stand options. The VE is an expert in vocational rehabilitation, and plaintiff stipulated to her qualifications as an expert. (Tr. 66-67.) Estimating the number of positions that allow a sit/stand option is squarely within a VE's expertise. See Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004); Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).

Accordingly, plaintiff's argument is without merit.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


       /S/   David D. Noce       
**UNITED STATES MAGISTRATE JUDGE**


Signed on December 9, 2013.